No. 20,802.

THE ATCHISON SAVINGS BANK, *Appellant,* v. W. A. POTTER, *Appellee.*

### SYLLABUS BY THE COURT.

1. TRIAL—*Instructions—Waiver.* In this case it was not error to refuse an instruction touching the matter of waiver.

2. SAME—*Inconsistency of Special Findings.* Under the rule requiring the harmonization of special findings with themselves and with the general verdict, the one returned by the jury touching knowledge of the circumstances under which the note sued on was obtained by the plaintiff did not constitute sufficient inconsistency to warrant a reversal.

3. PROMISSORY NOTE—*Fraudulent Representations—Evidence.* When a party is charged with having made fraudulent representations, others of a similar character made about the same time to other persons may be shown in order to shed light upon the question of motive, but such statements made by others in the absence of the person charged are incompetent.

4. FAILING BANK—*Transfer of Stock—Statute Construed.* The statute prohibiting the transfer of shares of stock in a failing bank (Gen. Stat. 1915, § 570) is for the protection of creditors, but as between the buyer and seller of stock the transfer may be binding.

5. SAME—*Sale of Stock—Promissory Note—Consideration.* The stock of a bank in a failing condition may still be a sufficient consideration for a note given for its purchase, and in this case it was error to instruct that no legal sale could be made if the bank was in a failing condition and that the note given therefor would be without consideration if such stock could not at the time be legally transferred.

Appeal from Logan district court; JACOB C. RUPPENTHAL, judge. Opinion filed April 12, 1917. Reversed.

*C. L. Kagey*, and *R. M. Anderson*, both of Beloit, for the appellant.

*H. A. Russell*, of Scott City, for the appellee.

The opinion of the court was delivered by

WEST, J.: The bank sued to recover on a promissory note for $1100 executed by the defendant July 3, 1912. The defense was that the note was obtained by fraudulent representations and was wholly without consideration. It was alleged that James Bowie and H. J. Harwi, president and cashier of the Russell Springs State Bank, and Rollin Buell came to the defendant at his farm, whereupon Bowie offered to sell him certain stock in the last-named bank, representing that the shares belonged to T. M. Walker, president of the plaintiff bank and that Walker wanted to sell to, the farmers of Logan county to interest them and their friends in, the local bank, which was in first-class condition and able to pay a dividend of 20 per cent for the year 1912; that the stock would be sufficient to pay off and discharge the note and the defendant would not be called upon to pay anything, but that it would be liquidated by the dividends, and if the defendant was not satisfied the stock would be taken back and some one procured to take it and the defendant's note returned to him; that Bowie was agent for the plaintiff, and that the Russell Springs bank was hopelessly insolvent; that the statements made by Bowie, as president of the latter bank, were false and fraudulent and known to be so by him, and were made for the purpose of inducing the defendant to purchase the stock from the plaintiff; that Bowie was agent for the plaintiff in the sale of the stock, which was never delivered to the defendant. The reply, after a general denial, specifically denied that the plaintiff was the owner or had any interest in the stock sold to the defendant; denied that Bowie, Harwi or Buell was its agent or agent of its president, T. M. Walker, or that they ever were authorized by him to make any statements with reference to the stock, and averred that Walker, president of the plaintiff bank, was not the owner of the stock and had no interest in it.

The jury found for the defendant, and answered special questions to the effect that the plaintiff did not own the stock sold; that it paid the amount of the note when it received it; that it authorized or permitted false representations to be made to the defendant to procure the note sued on; that the defendant was induced to execute the note by the false representations as to the dividends and condition of the bank; that these were made by Bowie; that the consideration for the note was $1100, and that the Russell Springs bank was in a failing condition on July 3, 1912. "At the time it took the note, did plaintiff have knowledge of the circumstances under which the note was obtained? Answer, No." The plaintiff appeals and assigns as error the admission of improper evidence, the refusal of certain instructions and the denial of the motion for new trial.

Underneath all these complaints is the further one that the testimony failed to show agency on the part of the man who sold the stock to Mr. Potter. The plaintiff did not own the stock but did pay the face of the note when it received it, and so the jury found. It would seem logically inevitable that in order to convict the bank of the alleged fraud there must be testimony showing that Bowie was acting as its agent in making the representations to the defendant touching the dividends and condition of the bank. It is clear enough that Bowie, Harwi and Buell went out to the defendant's farm and in about fifteen minutes he was talked out of a note for $1100. The answer charged the three men with making the false representations, but the jury acquit two of them and convict only Mr. Bowie. Buell was cashier of the Russell Springs bank, Harwi had been and wanted to be, and Bowie was its president. Mr. Buell had been recommended for cashier of the Russell Springs bank by Mr. Walker, president of the plaintiff bank. Mr. Walker was well advised as to the condition of the latter bank and of complaints to and the demands by the bank commissioner. Mr. Woodford, the plaintiff's cashier, was kept posted by Mr. Buell as to the situation at Russell Springs, and when the note sued on was executed the Russell Springs bank was technically insolvent. On the 20th of June, 1912, the bank commissioner wrote Mr. Walker advising him not to take any action without talking with the commissioner

about it, adding: "We might get our objects crossed unless we work together. I would be glad indeed to keep you fully informed, as the case goes on." On the same day he wrote Harwi to cease all further making of loans, allow no further overdrafts and honor no checks on the bank which would result in overdrafts. On the 24th of June he wrote the directors of the Russell Springs bank, including James Bowie, ordering them to remove Mr. Harwi as cashier, basing the order on the condition of the bank. On June 27 he wrote Mr. Walker that his assistant had succeeded in establishing Mr. Buell as acting cashier, "in accordance with your wishes as expressed in your letter introducing Mr. Buell." On the 7th of July Mr. Buell wrote the bank commissioner touching the condition in which he found things in the bank, which letter was on the 9th forwarded to Mr. Walker. From Mr. Woodford's testimony we learn that when Mr. Buell was sent out to the Russell Springs bank it owed the plaintiff bank between $40,000 and $50,000; that some of the stockholders were stockholders of the plaintiff bank, including Mr. Walker, the president; that some of the others who sold stock at this time were customers of the plaintiff bank and had purchased stock on the recommendation of the president or some officer thereof.

"Q. And as a matter of fact, you folks felt some responsibility for them, did n't you, for recommending it? A. Not as a bank.

"Q. Not as a bank? They purchased the stock on your recommendation, and you did n't feel responsible? A. Your question was to me, upon recommendation of an officer of the bank."

"Q. What officer? A. Mr. Walker.

"Q. Mr. T. M. Walker. Now when you received these notes, particularly this note of Mr. Potter's from Mr. Harwi's hands, at Atchison, you knew that it was for the purchase of stock of the Russell Springs State Bank, did n't you? A. I did.

"Q. You knew the condition of the Russell Springs State Bank, did n't you? A. Pretty well.

.    .    .    .    .    .    .    .    .    .    .

"Q. You were acquainted with the conditions out here? A. Yes, sir."

There were emphatic and repeated denials of any authorization to any one to make the representations complained of, and the most positive declaration that neither Harwi, Bowie nor Buell was its agent to look after its interests. A good deal is said about the alleged representation that the stock sold to

Mr. Potter belonged to Mr. Walker, the president of the plaintiff bank. We find no proof as to whom the stock belonged, but the testimony of Mr. Harwi would indicate that it was treasury stock, as he testified that the certificate was still attached to the stub at the time of the trial. At any rate the jury confined the false representations to the dividends and condition of the bank, eliminating any question as to the ownership of the stock.

The theory of the defense is that the Atchison people undertook to unload the stock of the Russell Springs bank by going out into the remote regions and selling it to the well-to-do farmers; that part of the scheme was to have the local man in whom farmers had confidence go out and induce them to buy; that by telling the defendants that Mr. Walker of the Atchison bank wanted to sell his stock because it was too far away from him the farmer would be led to believe that what was good property for Mr. Walker would be good for him.

The theory of the plaintiff is that the stock-selling project was largely for the purpose of reinstating Harwi as cashier. Mr. Harwi wrote to the bank commissioner September 7, 1912, enclosing a request of stockholders that he be reinstated, saying, "You will see that not counting my mother's stock and mine, that all the stock has signed this request except 46 shares, and they would have all signed had they been able to be here." Another letter on the same day stated that certain named stockholders had sold all of their stock, among them T. M. Walker; that it was bought by people whose names were enclosed, including W. A. Potter, ten shares. On the same day a letter from the stockholders all requesting the reinstatement of Harwi was written, signed by 13 stockholders, including the defendant. This was but little more than two months after he had bought the stock and given his note therefor. While there may be some foundation for both theories the jury adopted the former.

It is urged that the defendant by paying no attention to his investment for two or three years, not even paying the interest or requiring the stock to be delivered to him or attempting to exercise the rights of a stockholder, should be held to have waived any defense on the ground of failure of consideration, as he knew of Harwi's deposal and reinstatement and of the

condition of the bank within a short time after he had bought the stock. But waiver was not pleaded, and in any aspect of the case it should not be decided on this point.

Complaint is made that the findings are inconsistent in that one was to the effect that the bank authorized or permitted somebody to make false representations to procure the note, and another that it did not know the circumstances under which the note was obtained. It is suggested with considerable force that if according to still another finding the plaintiff authorized Bowie to make false representations it knew what they were. The word circumstances as used in the finding is a very uncertain term, and might include the number of men who went together, the kind and amount of talking done and by whom, or various other things. If, as found by the jury, the bank authorized some unnamed person to secure the note by fraud, and Bowie did so secure it, and it took and paid for such note, it can not make much difference how detailed a knowledge it had of the circumstances, for in effect it would be receiving the fruits of its own wrong. And it can hardly be said that the finding is so inconsistent with the others and with the general verdict as to require reversal.

It is complained that evidence of similar representations made to other purchasers of stock about the same time were admitted. Assuming that the agency was established, similar transactions on the part of the same agents would be competent as showing motive; but in one of these other instances Bowie was not present, and as no one is accused by the jury of having made any false statements except Bowie it is not perceivable how statements made by others to other purchasers could show any motive on the part of Bowie, and to this extent the evidence was erroneously admitted.

The defendant seems to have paid no attention to his investment for a long time, and finally, when sued on his note, defended on the ground that it was procured by fraud and wholly without consideration. While the bank was technically in an insolvent condition, it does not necessarily follow that the stock was of no value whatever, for after a time conditions were changed for the better, and doubtless at many times during his long ownership he could have sold for a fair consideration.

Bank v. Potter.

Four days after the note was given Mr. Buell wrote the bank commissioner that while the bank had loaned too liberally, he believed the employees of the bank had done no crooked work; that the notes were well secured. "The makers of the notes have the stuff and so it is only a question of time until everything will be in good condition." This letter was transmitted by the recipient to Mr. Walker, and Mr. Woodford wrote back saying, among other things, "Buell is a man who forms his own opinions regardless of his surroundings, and we are forced to admit and glad to do so, that Mr. Walker found the conditions exactly as set forth by Mr. Buell."

In the 9th instruction the jury were told that if the bank was in a failing condition on July 3, 1912, "Then no legal sale of stock in said bank could be made, and the note sued upon would be without consideration, if nothing was given for it by the plaintiff, or nothing other than the attempted sale and transfer of bank stock if such stock could not at the time be legally transferred." This means that stock which sold at 110 in a bank regarded so highly by Buell and Woodford could constitute no consideration for the note. The statute prohibiting the transfer of shares of a failing bank, General Statutes of 1915, section 570, is for the protection of creditors, but as between the buyer and seller of stock the transfer may be binding.

"An unregistered transfer of stock would not be invalid as between vendor and vendee." (*Bank v. Strachan,* 89 Kan. 577, 582, 132 Pac. 200.)   See, also, *Culp v. Mulvane,* 66 Kan. 143, 71 Pac. 273; *Barnhouse v. Dewey,* 83 Kan. 12, 109 Pac. 1081; *Telephone Co. v. Longfellow,* 85 Kan. 353, 356, 116 Pac. 506.

Other matters are pressed which in view of the conclusion reached need not be discussed.

For the reasons indicated the judgment is reversed and the case remanded for further proceedings.